DeAnne Casperson, Esq. (ISB No. 6698)
dcasperson@holdenlegal.com
Amanda E. Ulrich (ISB No. 7986)
aulrich@holdenlegal.com
HOLDEN KIDWELL HAHN & CRAPO, P.L.L.C.
P.O. Box 50130
1000 Riverwalk Drive, Suite 200
Idaho Falls, ID 83405
Telephone: (208) 523-0620
Facsimile: (208) 523-9518

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THOMAS JULIEN,<br><br>     Plaintiff,<br>v.<br><br>BECHTEL MARINE PROPULSION CORPORATION, a Delaware corporation; BECHTEL BETTIS, INC., a Delaware corporation,<br><br>     Defendants. | Case No. _____<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff, Thomas Julien, by and through his counsel of record and as a cause of action against Defendants Bechtel Marine Propulsion Corporation and Bechtel Bettis, Inc., collectively alleges and complains as follows:

1 - COMPLAINT AND DEMAND FOR JURY TRIAL

## JURISDICTION AND VENUE

1. This is an action brought under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*; the Idaho Human Rights Act, Idaho Code § 67-5901, *et seq.*; and the common and statutory law of the State of Idaho.

2. Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331, 1332, and 1343(4) and 1367; and 29 U.S.C. § 621, *et seq.*

3. This action properly lies in the District of Idaho, Eastern Division, pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## PARTIES

4. Plaintiff Thomas Julien ("Mr. Julien" or "Plaintiff") is a male citizen and resident of the United States of America, who is, and at all times relevant hereto was, a resident of Bonneville County, Idaho. Mr. Julien is 57 years old.

5. Bechtel Marine Propulsion Corporation ("BMPC") is a Delaware corporation with its principal place of business in Pennsylvania, doing business in Bonneville County, Idaho.

6. Bechtel Bettis, Inc. ("BBI") is a Delaware corporation with its principal place of business in Pennsylvania, doing business in Bonneville County, Idaho.

7. On information and belief, BBI is a sister or parent company of BMPC.

8. At all times material to this Complaint, BMPC and BBI (collectively "Defendants") each regularly employed twenty or more persons, and were engaged in an industry affecting commerce, bringing Defendants within the ambit of 29 U.S.C. § 621, *et seq.*; and Idaho Code § 67-5901, *et seq.*

## FACTS COMMON TO ALL COUNTS

9. Plaintiff realleges and incorporates by reference paragraphs 1 through 8 as though fully set forth herein.

10. In June, 1989, Mr. Julien began his employment at the Naval Reactor Facility ("NRF") in Idaho Falls, Idaho.

11. At all times pertinent to this matter, BMPC and/or BBI were Mr. Julien's employer at the NRF.

12. During the course of his employment, Mr. Julien received paychecks from either BMPC or BBI.

13. Mr. Julien's most recent position was a Waste Team Manager.

14. Throughout his employment with Defendants, Mr. Julien received excellent performance reviews and was never subject to any significant disciplinary action.

15. During many years of his employment, Mr. Julien was required to perform shift differential work. Shift differential work consisted of continuously working four days on and four days off.

16. Mr. Julien was paid an additional 3% of his base salary per paycheck to compensate him for the shift differential work schedule.

17. Mr. Julien also received pay differentials for other reasons. Consequently, his paycheck was not the same each pay period.

18. Mr. Julien continued to be assigned to shift differential work until approximately September 1, 2003, at which time he was assigned to work what Defendants referred to as a 9/80 shift, meaning every other Friday he was off work.

19. Although Mr. Julien's schedule changed, Defendants' payroll department claims it never adjusted Mr. Julien's paychecks to remove the additional pay for shift differential work.

20. Unbeknownst to Mr. Julien, Defendants allege Mr. Julien continued to receive pay for shift differential work after returning to his previous schedule.

21. Assuming Defendants are correct in their allegation of overpayment, Mr. Julien never realized that Defendants continued to pay him for shift differential work after ceasing to perform a shift differential schedule. His paycheck was direct deposited and the time sheet system did not reflect the shift differential pay. Mr Julien assumed Defendants were paying him correctly.

22. According to Defendants, they continued to pay Mr. Julien for shift differential work until approximately April 1, 2009.

23. On or about April 9, 2009, Mr. Julien was notified by Jason Hollinger, Waste Operations Manager, that there was a significant problem with his paycheck and that Mr. Julien would be required to take part in a meeting with Human Resources.

24. On or about April 15, 2009, Mr. Hollinger informed Mr. Julien that he had set up a meeting with Human Resources for 7:00 a.m. that morning. Mr. Julien attended the meeting as requested.

25. Present at the April 15, 2009, meeting with Human Resources were Rick Nieslanik, Defendants' Human Resources Manager, Gene Watson, Defendants' Waste Shipping Manager, and Mr. Hollinger.

26. Mr. Nieslanik informed Mr. Julien that there had been an audit performed on payroll and over 200 discrepancies were found. He explained Defendants had discovered that Mr. Julien was receiving pay for shift differential work when he should not have been.

27. Mr. Nieslanik told Mr. Julien that he had been overpaid in the amount of $13,809.48, and Defendants demanded payment.

28. Mr. Julien inquired of Mr. Nieslanik whether Defendants could legally require him to pay back the entire overpayment, spanning the course of over five years.

29. Mr. Nieslanik informed Mr. Julien that he did not know the answer to that.

30. Mr. Julien then stated that he believed the company should bear some responsibility in the matter because it was a payroll error. Mr. Julien also indicated he would consult with his attorney.

31.   Mr. Watson then stated, "Gee Tom, it's only money."

32.   At the conclusion of the meeting, Mr. Nieslanik, Mr. Hollinger and Mr. Watson all stated that Mr. Julien could take as much time as necessary to figure out how to deal with the situation.

33.   On or about June 9, 2009, Mr. Hollinger stated that Mr. Julien would be required to attend another meeting on the paycheck issue.

34.   Mr. Julien attended the meeting. Also present at the meeting were Mr. Hollinger and Mr. Watson.

35.   Watson handed Mr. Julien a letter dated June 9, 2009, a true and correct copy of which is attached hereto as Exhibit A. The letter stated the amount Mr. Julien owed Defendants $13,809.48 and that Mr. Julien would agree to have $700 deducted from his paycheck each month for the overpayments. The letter was signed by Mr. Nieslanik. Attached to the letter was an "Acknowledgment of Earnings Adjustment," with a line for Mr. Julien's signature, stating that Mr. Julien agreed to the terms dictated in the letter and that he would pay BMPC back in full.

36.   Mr. Julien again inquired as to whether Defendants were going to assume any responsibility in the matter.

37.   Mr. Watson told Mr. Julien that the attorney for the company could not find anything to prevent the company from going back five years and seven months for the entire amount of overpayment.

38. Mr. Julien informed Mr. Watson and Mr. Hollinger that he would have his attorney look into the matter.

39. Mr. Julien refused to sign the "Acknowledgment of Earnings Adjustment" form attached to the letter from Mr. Nieslanik giving BMPC the authority to deduct money from his paychecks. The meeting ended.

40. On or about June 15, 2009, Mr. Julien met with his attorney to determine what action to take in response to the letter from Mr. Nieslanik.

41. On or about June 25, 2009, Mr. Julien received a call from Mr. Hollinger, stating that Mr. Julien needed to contact Mr. Nieslanik to tell him "what was going on with the attorney."

42. Mr. Julien telephoned Mr. Nieslanik and informed him that his attorney was planning to send a letter to Mr. Nieslanik requesting an accounting from BMPC regarding calculation of the sum of $13,809.48 that was allegedly due and owing by Mr. Julien.

43. On or about July 1, 2009, Mr. Julien's attorney sent a letter to Mr. Nieslanik, to be forwarded to Defendants' attorney, requesting a detailed accounting of the alleged overcompensation, including supporting documents. A true and correct copy of the letter is attached as Exhibit B.

44. On or about July 16, 2009, Mr. Julien received a call from Mr. Hollinger at approximately 9:30 a.m. while he was on shift. He informed Mr. Julien that he would be required to attend another meeting at 11:30 a.m. that day.

45. When Mr. Julien arrived at the meeting, Josh Dubriel, a human resources generalist, and Mr. Hollinger, were present.

46. At the meeting on July 16, 2009, Defendants terminated Mr. Julien's employment. Mr. Hollinger read Mr. Julien a letter of termination, a true and correct copy of which is attached hereto as Exhibit C.

47. Mr. Julien objected to the termination.

48. Mr. Hollinger's only response was that the "decision had been made."

49. Mr. Hollinger asked Mr. Julien whether he would like to sign a letter stating that he was voluntarily resigning.

50. Mr. Julien refused to voluntarily resign.

51. As a result of his termination, Mr. Julien filed a complaint with the EEOC.

52. The EEOC issued Mr. Julien a Notice of Right to Sue letter on December 2, 2009, a true and correct copy of which is attached hereto as Exhibit D.

## COUNT ONE
## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

53. Mr. Julien incorporates by this reference each and every allegation set forth in paragraphs 1 though 52 as though fully set forth herein.

54. Mr. Julien performed his job with Defendants satisfactorily.

55. Mr. Julien questioned Defendants' authority to seek repayment from Mr. Julien regarding his overpayment.

56. Mr. Julien consulted an attorney regarding Defendants' claim that he was responsible for repaying the alleged overpayment he received.

57. Through his attorney, Mr. Julien requested an accounting of the amount for which Defendant was seeking repayment from Mr. Julien.

58. Defendants terminated Mr. Julien's employment after learning that he had consulted an attorney regarding the overpayment matter.

59. Defendants terminated Mr. Julien's employment for questioning Defendants' authority to seek repayment, for consulting with an attorney regarding his rights on the overpayment matter, and/or for requesting an accounting of the amount for which Defendant was seeking repayment from Mr. Julien.

60. Defendants' termination of Mr. Julien's employment for questioning Defendants' authority to seek repayment, for consulting with an attorney regarding his rights on the overpayment matter, and/or for requesting an accounting of the amount for which Defendant was seeking repayment from Mr. Julien was a violation of public policy.

61. As a direct and proximate result of Defendants' firing Mr. Julien in violation of public policy, Mr. Julien has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Mr. Julien is thereby entitled to damages, such amount to be proven at trial.

## COUNT TWO
## VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT
## AGE DISCRIMINATION

62. Mr. Julien incorporates by this reference each and every allegation set forth in paragraphs 1 through 61 as though fully set forth herein.

63. Defendants terminated Mr. Julien's employment.

64. Mr. Julien was over 40 years of age at the time of termination.

65. Mr. Julien was performing his job satisfactorily.

66. Defendants terminated Mr. Julien's employment because of his age.

67. As a direct and proximate result of BMPC's actions and/or failures to act, Mr. Julien has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Mr. Julien is thereby entitled to damages as such amount to be proven at trial.

68. BMPC's conduct was willful, and done with a reckless disregard for Mr. Julien's federally protected rights, for which Julien is entitled to liquidated damages pursuant to 29 U.S.C. § 626(b).

## COUNT THREE
## VIOLATION OF THE IDAHO HUMAN RIGHTS ACT
## AGE DISCRIMINATION

69. Mr. Julien realleges and incorporates by reference paragraphs 1 through 68 as though fully set forth herein.

70. Defendants violated the Idaho Human Rights Act, Idaho Code § 67-5901, *et seq.*, by subjecting Mr. Julien to discrimination on the basis of age.

71. Defendants terminated Mr. Julien's employment because of his age or used his age as a motivating factor in its decision.

72. As a direct and proximate result of Defendants' actions and/or failures to act, Mr. Julien has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Mr. Julien is thereby entitled to damages, such amount to be proven at trial.

## COUNT FOUR
## BREACH OF IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING

73. Mr. Julien realleges and incorporates by reference paragraphs 1 through 72 as though fully set forth herein.

74. An implied covenant of good faith and fair dealing existed between Defendants and Mr. Julien due to Mr. Julien's employment with Defendants.

75. The implied covenant of good faith and fair dealing required Defendants to perform in good faith the obligations stemming from Julien's employment with Defendants, including the duty not to discharge him for reasons that violate public policy or Mr. Julien's civil rights.

76. Defendants were also required to abide by their own covenants as part of the implied covenant of good faith and fair dealing. A true and correct copy of Bechtel's covenants are hereto attached as <u>Exhibit E</u>. Such covenants include:

   a. Treat Bechtel colleagues with mutual respect, trust, and dignity and believe they are acting in the best interest of the company;

   b. Communicate early, honestly, and completely with all who have a direct interest in the subject. Listen to others' point of view.

   c. Earn trust by accepting and honoring agreements, keeping promises, and discussing needed changes before acting.

   d. Work jointly to resolve disagreements in good faith. If necessary, go to a higher authority together, then accept and support the solution.

77. Defendants breached the implied covenant of good faith and fair dealing.

78. As a direct and proximate result of Defendants' breach of the implied covenant of good faith and fair dealing, Mr. Julien has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Mr. Julien is thereby entitled to damages, such amount to be proven at trial.

## **ATTORNEY'S FEES**

79. As a further and direct result of Defendants' actions and/or failures to act, Mr. Julien has been compelled to retain the services of counsel, and thereby incurred, and will continue to incur, costs, expert witness fees, and attorney fees which should be

required to be paid by Defendants pursuant to Idaho Code §§ 12-120 and/or 12-121 and 29 U.S.C. § 216(b).

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury as to all issues triable to a jury in this action.

## PRAYER FOR RELIEF

Wherefore, Mr. Julien seeks judgment against Defendants as follows:

1. For damages in an amount as shall be proven at trial;

2. For liquidated damages in an amount as shall be proven at trial;

3. For attorney's fees pursuant to statute and costs of suit;

4. For prejudgment interest on all amounts claimed; and

5. For such other and further relief as the Court deems just and proper.


Date: January 22, 2010                  /s/
                                        DeAnne Casperson, Esq.
                                        HOLDEN, KIDWELL, HAHN & CRAPO, P.L.L.C.


G:\WPDATA\DC\15556 Julien\Pleadings\Complaint.wpd